**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**SHIRLEY BEZERRA STEEL, et al.**

      Plaintiffs,               Case No.: 6:21-cv-02035-CEM-DAB

v.

**BREVARD COUNTY SCHOOL**
**BOARD, et al.,**

      Defendants.
_____/

## INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AGAINST PLAINTIFFS

Defendants, **MARK MULLINS** ("Dr. Mullins"), **MISTY BELFORD** ("Belford"), **CHERLY MCDOUGALL** ("McDougall"), and **JENNIFER JENKINS** ("Jenkins") (collectively "Individual Defendants"), through undersigned counsel and pursuant to Fed. R. Civ. P. 56, and Local Rule 3.01, hereby move for final summary judgment against Plaintiffs **SHIRLEY BEZERRA STEEL** and **JEFFREY STEEL,** and **S.B.** on all counts.

## STATEMENT OF UNDISPUTED FACTS

Plaintiffs' Third Amended Complaint (Doc. 49)—the operative complaint—brings claims under the Florida and Federal Constitution (Counts I, V, and IX), Disability Discrimination Statute (Counts VIII & XI), and Tort Claims (Counts XII & XV) as to the Individual Defendants. As set forth in the following memorandum of

law, no genuine dispute of a material fact exists and Plaintiffs' claims fail on the merits. Thus, the Individual Defendants are entitled to final summary judgment as a matter of law.

## The Board and Its Response to COVID-19

On March 1, 2020, the Florida Department of Health (hereinafter "DOH"), issued a press release noting the first two "presumptive positive" cases of severe acute respiratory syndrome coronavirus, (hereinafter "COVID-19") in the State of Florida[1]. That same day, the State Surgeon General and State Health Officer declared that a Public Health Emergency existed Florida as a result of COVID-19. *See* Fla. Exec. Order No. 20-52 (Mar. 9, 2020). And on March 9, 2020, Governor DeSantis declared a state of emergency within Florida as to COVID-19. *Id.*

Less than a week later on March 13, 2020, the Florida Department of Education (hereinafter "DOE") took the unprecedented step of recommending school districts extend their spring breaks, stating "Keeping students healthy and safe is my number one priority, and that is why we are recommending that districts follow the CDC's guidance for Florida."[2] That extension subsequently turned into a recommendation that schools remain closed the remainder of the 2019-2020 academic year.[3]

---

[1] ECF 109-17 at 1. Defendants respectfully request the Court take judicial notice of this and other government website pages cited throughout the statement of facts. It is appropriate to take judicial notice of such information as it is published on an official government webpage and therefore the veracity of the information "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Chapman v. Abbott Labs*, 930 F. Supp. 2d 1321, 1323 (M.D. Fla. 2013) (quoting Fed. R. Evid. 201(b)(2)).
[2] ECF 109-18 at 1.
[3] ECF 109-19 at 1.

Defendant, Brevard County School Board, is the governing body of the Brevard County School District ("District"). Fla. Stat. §§1001.30; 1001.32(2). The Board adopts policies for the operation of the District consistent with Florida law and applicable rules. *Id.* at §§1001.41(1) through (3); §1001.43; §1012.22(1). Defendants Jenkins, McDougall, and Belford are elected School Board Members. Defendant Mullins is an appointed Superintendent of Schools. As with all other school boards in the state, the Board heeded the recommendations of DOE and transitioned to online learning in March of 2020 for the remainder of the 2019-2020 school year[4].

Looking forward to the 2020-2021 school year, DOE announced recommendations to safely reopen Florida's schools on June 11, 2020, noting that "[r]eopening is a locally driven decision."[5] The recommendations highlighted that "cloth face coverings can be an important mitigation tool for individuals and families," and encouraged schools to "explore strategies to utilize them, to the extent feasible." ECF 109-21 at 54. On July 6, 2020, DOE issued Emergency Order No. 2020-EO-06 Order, detailing the requirements for school reopening.[6]

Consistent with the Order, the Board drafted a reopening plan with input from district staff, medical professionals, and community members.[7] Additionally, as part of the reopening plan, the Board adopted an Emergency Policy Requiring Face Coverings, which mandated face coverings, with some exceptions (including for K-2d

---

[4] ECF 109-8.
[5] ECF 109-20 at 1.
[6] Also available at: https://www.fldoe.org/core/fileparse.php/19861/urlt/DOE-2020-EO-06.pdf.
[7] ECF 109-23.

grade), which ultimately remained in place until the end of the 2020-2021 school year on June 3, 2021.[8]

Following the 2020-2021 school year, "[s]ociety's collective response to the COVID-19 virus ha[d] become a cultural and political flash point." *Dortch v. Alachua Cnty. Sch. Bd.*, 330 So. 3d 976, 977 (Fla. 1st DCA 2021). By July of 2021, the Delta COVID-19 variant, with increased transmission rates, had spread throughout Florida and led to an increase in COVID-19 cases. ECF 109-11. The increase in COVID-19 cases, led Defendant Jenkins to include a mask policy as a discussion item on the July 29, 2021, Meeting Agenda. *Id.* Following discussion on July 29, 2021, re-implementation of the Mask Policy was included on the August 10, 2021, Meeting Agenda. *Id.*

The next day, July 30, 2021, Governor DeSantis issued Executive Order 21-175, which directed the DOH and DOE to issue emergency guidance aimed at mask and other mitigation policies, requiring that School Board ensure those policies "d[id] not violate Floridian's constitutional freedoms . . . " *See* Fla. Exec. Order No. 21-175 (July 29, 2021). In response, on August 8, 2021, DOH adopted emergency rule 64DER21-12, "due to the spread of the COVID-19 delta variant." *See Notice of Emergency Rule 64DER21-12*, FLA. DEP'T OF HEALTH (Aug. 6, 2021). As to masks in schools, specifically, Order 64DER21-12 stated:

> (d) Students may wear masks or facial coverings as a mitigation measure; however, the school must allow for a parent or legal guardian of the student to opt-out the student from wearing a face covering or mask.

---

[8] ECF 109-9; ECF 109-10.

*Id.* The Rule was immediately challenged by a group of concerned parents. *See Scott v. DeSantis*, Leon Cnty. Cir. Ct. Case No. 2021-CA-001382, Complaint (filed Aug. 6, 2021).

Thereafter, on August 10, 2021, the Board discussed the re-implementation of the 2020 Mask Policy.[9] Local health officials present at the meeting consistently stated that "universal masking, social distancing, hand washing and vaccinations [were] the most effective mitigation strategies" at that time to slow the spread of COVID-19. *Id.* Ultimately, a motion to reimplement the 2020 Mask Policy and a motion to amend the policy to change the opt-out provisions were put to a vote of the Board.  Both motions failed by a vote of 3-2. *Id.*

On August 27, 2021, following a four-day bench trial, Leon County Circuit Judge John Cooper issued a verbal ruling granting a preliminary injunction and enjoining both DOE and DOH from "taking action to effect a blanket ban on face mask mandates by local school boards." *Scott v. DeSantis*, Leon Cnty. Cir. Ct. Case No. 2021-CA-001382, Final Judgment (Sept. 2, 2021). That order was later stayed by appeal, and the case dismissed as moot prior to the First District Court of Appeal issuing an opinion on the merits of the case. *See DeSantis v. Scott*, Case No. 1D21-2685, Ord. Granting Mtn. to Reinstate Auto. Stay (Oct. 27, 2021); Ord. Dismissing Appeal as Moot (Dec. 22, 2021).

---

[9] ECF 109-12.

By August 29, 2021, Brevard County Schools were experiencing an extremely high number of COVID-19 cases and quarantines, prompting the Board hold an emergency meeting on August 30, 2021, to discuss the implementation of a mask policy—the Emergency K-12 Face Covering Requirement at the heart of this dispute (hereinafter "Emergency Policy").[10] There was significant discussion, including over 130 public comments, and amongst all Board members regarding implementation of the Emergency Policy. *See id.*; *see also* ECF 109-34.

Specifically, Defendant Belford spoke and provided statistics, regarding her view that the District's schools were increasing the spread of COVID-19 and significantly impacting the community. ECF 109-13 at 4-6. Defendant McDougall cited current Centers for Disease Control guidelines, indicating that if students were properly masked, it could help curb quarantines and keep students in schools. *Id.* at 5. And Defendant Jenkins highlighted that there were currently Board employees ill with COVID-19, some on ventilators, that two Board employees had passed away as a result of COVID-19, and at least one student was currently in the hospital fighting COVID-19. *Id.* at 6. At the end of the nearly-five hour meeting, the Emergency Policy was approved by a vote of 3-2. *Id.* An amendment, limiting the initial period of the Emergency Policy to thirty days was also approved by the same margin. *Id.*

The Board's justification for the Emergency Face Covering Policy was further explained in response to a letter from DOE, including the Board's good faith belief

---

[10] ECF 109-13.

6

that the Emergency Policy was in compliance with the Florida Constitution, Florida Statutes, and Rule 64DER21-12. ECF 109-28 at 21. Therein, the Board cited statistics received from the DOH showing a "steep and troubling" surge of COVID-19 in schools, which already had, only two weeks into the school year, required the temporary closure of one middle school. ECF 109-28 at 21-22. The Board further explained that because Rule 64DER21-12, did not "does not state that the school must allow an opt-out for any and all—or no—reasons," it believed in good faith that the Emergency Face Covering Policy, which included a limited opt-out provision, was in compliance with the Rule. ECF 109-28 at 26.

## The Plaintiffs

Plaintiff, Shirley Bezerra Steel ("Mrs. Steel"), is the mother of Plaintiff, eight-year-old S.B., both of whom are originally from Brazil. ECF 109-3 at 11:25-12:2. Mrs. Steel married Plaintiff, Jeffrey Steel (hereinafter "Steel"), on January 25, 2020. ECF 109-3 at 11:23-24. Shortly thereafter on March 12, 2020, Mrs. Steel and her two youngest children, S.B. and D.B., moved to the United States of America to live with Steel in Melbourne, Florida. ECF 109-3 at 11:23-11:2.

Steel, through his marriage to Mrs. Steel, is S.B.'s stepfather. ECF 109-3 at 23:17-24:24. Steel has not adopted S.B. and S.B.'s biological father, who lives in Brazil, still has full parental rights as to S.B. *Id.* Additionally, pursuant to a custody agreement, Mrs. Steel has sole physical custody of S.B. and D.B., but their biological father is entitled to weekly phone calls with the children and additional visitation rights should Mrs. Steel travel to Brazil with the children. ECF 109-28.

Because of the spring 2020 school closures, S.B. did not start school in the District until the Fall of 2020. ECF 109-3 at 26:9-19. Initially, S.B. was enrolled in Kindergarten at Imagine School in West Melbourne. *Id.*

Shortly thereafter in early September 2020, school personnel in connection with S.B.'s teachers, and with the consent of Mrs. Steel, began the process of evaluating S.B. for exceptional student education ("ESE") services, relating to her speech impairment. ECF 109-1 at 66; 69-72. On the Parent Input form for the evaluation, Mrs. Steel explained that "S.B. [was] very healthy," but had delays with respect to basic functions. ECF 109-1 at 60. As part of the evaluation process, a speech language pathologist performed a formal evaluation, including an oral peripheral examination, on September 24, 2020, noting in the exam report that S.B.'s tongue was the "appropriate size" and that it "protrude[d] appropriately." ECF 109-1 at 52-54. A formal Individualized Education Plan ("IEP") was put in place on September 29, 2020. Under the heading "Health Concerns," the IEP stated, "none at this time." ECF 109-1 at 45.

Then on October 12, 2020, district employees suggested, and Mrs. Steel approved, additional referrals for academic and behavioral evaluations, including for cognitive functioning, occupational therapy, physical therapy, and adaptive functioning evaluations. ECF 109-1 at 55-60. A behavioral intervention plan was also developed to address classroom behaviors including aggression with other students, defiance, difficulty with transitions, and toilet training. ECF 109-1 at 64-67. As part of the additional evaluations, S.B.'s physician provided a physician statement, which

noted as to "Precautions/Contraindications" "no trampolines or extreme sports." ECF 109-1 at 61.

On January 26, 2021, S.B.'s IEP was amended to include the additional necessary services, such as occupational therapy, additional speech therapy, and physical therapy, and to change S.B.'s placement from a traditional classroom to a specialized ESE classroom, with very small group instruction in all academic areas. ECF 109-1 at 26-37. With the newly increased level of services and need for small, individualized instruction, it was additionally determined that a change in placement from Imagine Schools (a charter school), to Ocean Breeze Elementary would be necessary. *Id.*; ECF 109-1 at 41-43. The amended IEP again stated "none" under the heading of "Health Concerns." *Id.* at 26.

### S.B.'s Attendance at Ocean Breeze Elementary

Shelley Michaud, the principal of Ocean Breeze Elementary, first met S.B. and Mrs. Steel in the front office upon S.B.'s enrollment to the school. ECF 109-5 at 13:14-20. Upon arriving to Ocean Breeze Elementary, Defendant, Kristen Godden, became S.B.'s teacher. ECF 109-1 at 2-4. Ms. Godden received both her Bachelor of Science degree in elementary education and Master's Degree in special education from the University of Central Florida in 2011 and 2012, respectively. ECF 109-6 at 14:5-8. Ms. Godden began teaching full time in the District in 2012 and transferred to Ocean Breeze Elementary in 2018. ECF 109-29 at 54, 66.

S.B. was placed in a supported classroom with six other students of varying exceptionalities from Kindergarten to Third Grade. ECF 109-5 at 15:9-24. S.B.

received speech, physical, and occupational therapy in addition to the small group individualized instruction in Ms. Godden's class. ECF 109-1 at 25-38. was very social and had many friends in Ms. Godden's classroom. ECF 109-1 at 3. S.B. finished the remainder of the 2020-2021 school year without incident and made progress toward her individualized learning goals. *Id.* at 3-4.

Prior to the beginning of the 2021-2022 school year, on August 9, 2021, S.B.'s IEP was updated with the consent of Ms. Steel to add adaptive physical education as a service. ECF 109-1 at 2-13. No other changes were made. Defendant, Nichole Dougherty, who had worked at Ocean Breeze Elementary since 2018, was assigned as Mrs. Godden's classroom aide. ECF 109-10 at 21:1-3.

School began on August 10, 2021, and shortly thereafter the Emergency Policy was implemented on August 30, 2021. ECF 109-13 at 6. That evening, District communications officer, Richard Bruhn, sent an email to all District staff informing them of the implementation of the Emergency Policy. ECF 109-30 at 1. An announcement, which included a link to the text of the policy, was also placed on the District's website and sent to all District parents through email.[11] ECF 109-1 at 32. All communications indicated that the Policy was "effective immediately" and that "[a] five-day grace period may be extended to those who need to obtain exemption documentation." *Id.*

---

[11] *See Brevard School Bd. Approved Temp. Mandatory Face Mask Policy*, Brev. Cnty Sch. Bd. (Aug. 30, 2021).

Ms. Godden and Ms. Dougherty saw the email and reviewed and discussed the Policy prior to class on August 31, 2021. ECF 109-6 at 11:7-15; ECF 109-7 at 10: 3-21. The same day, Ms. Godden took the additional step of sending a note home regarding the Policy, which was attached to the outside of all of her student's backpacks. ECF 109-7 at 18: 17-23; ECF 109-7 at 19: 21-23; ECF 109-6 at 19:3-21:10.

Some parents approached Ms. Godden and requested an exemption from the Policy. ECF 109-6 at 19:3-12. To Ms. Michaud's recollection, she participated in at least three IEP meetings, requesting to modify an IEP to include specific documentation that the student had a contraindication that prevented the student from wearing a mask. Michaud Depp. ECF 109-5 at 32:11-15. For any student who did not have an exemption on file—either medical or through specific documentation in an IEP—the Emergency Policy was applied. ECF 109-5 at 26:20-28:21.

Steel first became aware that the Emergency Policy had been approved "right after they did it." ECF 109-3 at 50:21-23. Though aware of its existence, the Steels did not read the Emergency Policy, in full, until after October 7, 2021. ECF 109-3 at 51:10-22; ECF 109-4 at 43:16-18. Rather, based on social media posts and news reporting, the Steels assumed that the Emergency Policy did not apply to S.B. because she had an IEP. ECF 109-3 at 52:18-53:4; ECF 109-4 at 41:23-42:10. And, from August 31, 2021 though October 7, 2021, the Steels never contacted Ms. Godden, Ocean Breeze Elementary, or District staff regarding the Emergency Policy to ensure their assumptions were correct. ECF 109-4 at 44:13-17; ECF 109-3 at 54: 8-17. Steel did

make passing comments regarding masking in general to S.B.'s bus driver and bus aide in the mornings. ECF 109-3 at 56:13-23; ECF 109-3 at 57:7-11.

Because the Steels never sought an exemption, Ms. Godden and Ms. Dougherty offered a disposable mask to S.B., utilizing various methods to attempt to keep the mask from falling off. ECF 109-6 at 38:16-397; ECF 109-6 at 43:6-9. Initially, Ms. Godden and Ms. Dougherty attempted just placing the mask on S.B. as is. ECF 109-6 at 68: 5-10; ECF 109-7 at p. 39: 3-17. Because it would frequently fall off, within a week or so, they began to shorten the ear loops of the mask by either twisting the loops or tying knots in the loops. ECF 109-6 at 68:15-69:15. They tried this method for approximately three weeks, but the mask continued to frequently fall off. *Id.* At one point they attempted to use hair barrettes to secure the mask, but instantly took them off because S.B. would have been unable to remove the mask by herself. ECF 109-6 at 75:1-8.

Thereafter, Ms. Godden began searching online for different methods to keep a mask on. ECF 109-6 at 75:8-16. Eventually she came across a flyer from the Down Syndrome Resource Foundation. ECF 109-2. That flyer, coupled with an idea from another child's parent in the class, inspired the use of the blue cord to keep the mask on S.B.'s face. ECF 109-6 at 75:8-16; ECF 109-2. Admittedly, neither Ms. Michaud, Ms. Godden, nor Ms. Dougherty contacted the Steels prior to or while using the blue cord to keep the mask on S.B. ECF 109-6 at 42:23-43:8; ECF 109-7 at 41:21-24; ECF 109-5 at 44:25-45:4.

S.B. was able to remove the mask by herself and did so multiple times in Ms. Godden's class. ECF 109-6 at 41:16-25; 42:10-13; ECF 109-7 at 42:8-12. Additionally, S.B.'s mask was removed when eating, drinking, playing outside, during speech therapy, and during PE. ECF 109-7 at 45:9-46:3. If the mask dropped on the ground or became dirty, then it would be exchanged for a clean mask as needed. ECF 109-7 at 46:1-9; ECF 109-6 at 53: 9-15. Ms. Godden or Ms. Dougherty would remove the blue string, a classroom manipulative, at the end of the day to ensure that it was not lost or left at home. ECF 109-7 at 46:22-47:4.

Neither Ms. Godden nor Ms. Dougherty ever saw S.B. in any kind of distress. ECF 109-7 at 43:7-44:20; ECF 109-6 at 40:21-22; 56:1-5. Nor did they perceive a regression in toilet training, notice an increase in unusual behaviors, or attribute S.B.'s singular vomiting episode to mask use because the incidence of vomiting occurred shortly after breakfast and before S.B. had worn a mask for the day. ECF 109-6 at 43:15-44:24; ECF 109-7 at 43:19-44:20. Video of S.B. in the hallways and on the bus during this time further buttresses this testimony. ECF 109-24.

### Extension of Mask Policy, Updated DOH Rule and Challenges

At the September 21, 2021, Board Meeting, a majority of the Board voted to extend the Emergency Policy for 30 additional days, and to allow masks to be removed when social distancing was possible.[12] Thereafter, on September 22, 2021, the DOH

---

[12] ECF 109-14.

issued an updated emergency rule—Rule 64DER21-15. As to masks, the rule was

identical to Rule 64DER21-12, with the exception of adding the following language:

> (d) Students may wear masks or facial coverings as a mitigation measure;
> however, the school must allow for a parent or legal guardian of the student to
> opt-out the student from wearing a face covering or mask *at the parent or legal*
> *guardian's sole discretion.*

*Notice of Emergency Rule, Rule 64DER21-15*, FLA. DEP'T OF HEALTH (Sept. 22, 2021)

(emphasis added).[13] Rule 64DER21-15 and the DOE's attempt to enforce Rule

64DER21-15, through withholding of School Board member salaries was immediately

challenged in the Courts. *Alachua Cnty. Sch. Bd.*, 330 So. 3d 976 (Fla. 1st DCA 2021)

(challenge to district mask policy in light of DOH rule); *Sch. Bd. of Miami-Dade Cnty. v.*

*Fla. Dep't of Health*, 329 So. 3d 784 (Fla. 3d DCA 2021) (challenge to DOH Rule);

*Lloyd*, 570 F. Supp. 3d 1165 (S.D. Fla. 2021); *see also S.B. v. Lee*, 2021 WL 4755619

(E.D. Tenn. Oct. 12, 2021) (granting preliminary injunction prohibiting governor from

enforcing requirement to permit parental opt out of mask mandate).

On October 5, 2021, the Board again amended the Emergency Face Covering

Policy to allow Superintendent Mullins, in his discretion, to add a parental opt out

provision to the Emergency Policy when transmission rates lowered in Brevard

County[14]. On October 12, 2021, following significant back and forth correspondence,

the State Board of Education, issued an order threatening sanctions, if the Board did

not include an additional opt out provision for parents in their "sole discretion" in the

---

[13] Available at: https://floridahealthcovid19.gov/wp-content/uploads/2021/09/64DER21-15.pdf.
[14] ECF 109-15.

Emergency Policy. ECF 109-28. Thereafter, Dr. Mullins included an opt out provision in the Policy on October 22, 2021 because the District reached 50.1 per 100,000 cases. ECF 109-32.

## The Steel's Discovery and Response to Mask Use

On October 7, 2021, S.B. stepped off the bus wearing a mask, with the blue string still tied on the mask. ECF 109-4 at 49:14-22. Mrs. Steel was disappointed, shocked, and confused. ECF 109-4 at 50:8-9. She contacted Steel shortly after seeing S.B. that afternoon. ECF 109-4 at 50:1-7. The Steels did not attempt to contact Ocean Breeze Elementary or S.B.'s teachers that day to discuss S.B. wearing a mask. ECF 109-4 at 51:5-11.

S.B. went to school the next day, October 8, 2021, before the Steels had contacted the school. ECF 109-4 at 63:9-24. That day Steel contacted the Indian Harbor Beach Police Department and Defendant Jenkins' office. *Id.* Sometime between October 8, 2021, and October 12, 2021, Steel also escalated the issue to elected officials and the DOE. ECF 109-29.

Thereafter, on October 12, 2021, Steel contacted the school and met with Principal Michaud and School Resource Officer Imperato. ECF 109-29; 109-2. Principal Michaud offered to include Ms. Godden in the meeting, but Steel declined that request. *Id.* Steel explained his concerns regarding S.B. wearing a mask and stated that he had photos of the mask on S.B.'s face but declined to provide the photos. *Id.* Steel additionally requested, and the school honored, that S.B. not wear a mask at

school on October 12, 2021. *Id.* An IEP meeting was scheduled for the following morning, October 13, 2021, to discuss including a mask exemption in S.B.'s IEP. *Id.*

After the meeting, Principal Michaud met with Ms. Godden to get more information, made an incident report to the Department of Children and Families, which did not accept the case, initiated an investigation into the complaint, and informed Steel that S.B. would be eligible for a HOPE scholarship, which would allow the Steels to transfer S.B. to a different school program. *Id.* Principal Michaud additionally communicated this information to Mrs. Steel when she arrived to pick S.B. up from school later that day. *Id.* That afternoon Steel also reached out to School Board Member Matt Susin, seeking his support and noting: "I believe the public outcry at the time of exposure will be enormous." ECF 109-29.

The following morning, October 13, 2021, an IEP meeting was convened with Ms. Godden, Principal Michaud, the Steels and the rest of S.B.'s IEP team. BCSB-Steel/Michaud 82-83. At the meeting it was agreed that "[d]ue to [S.B.'s] physical and genetic concerns, and her speech impairment . . . [S.B. would] be exempt from any mask mandate." *Id.* at 82.

### Steel's Media Campaign

After October 13, 2021, Steel began an aggressive media campaign. First, prior to October 18, 2021, Steel established a fundraising page, "[S.B.'s] Rights," on the fundraising sight, "Give, Send, Go." *See [S.B.'s] Rights*, Give Send Go https://www.givesendgo.com/SofiasRights (accessed Oct. 30, 2022).

Thereafter, on October 20, 2021, Steel appeared at a press conference with elected officials in Brevard County. *See* ECF 109-27. Following the press conference, Steel participated in numerous additional interviews. ECF 109-30 at 3-4. Specifically, in part, Steel spoke with or appeared on the following news sources: OANTV, Flyover Conservative, His Glory, WIND (Radio), Alan Keyes TV, NewsMax, MAGA Institute, OAN Dan Ball, Fox and Friends, Tucker Carlson, Fox 35 Orlando, Epoch Times, Florida Today. *Id.* at 4.

Of note, Steel participated in an interview with Tucker Carlson on October 25, 2021. ECF 109-27. During that interview, photos of S.B. with a mask were shown and Steel claimed that the photos were taken on October 7, 2021, shortly after S.B. stepped off the bus. *Id.*

The Steels also established a website, which included a repository of all of the media coverage and interviews which Steel participated in. *See* https://stopmaskingkids.com/ (last accessed Oct. 30, 2022). And, Steel engaged the services of CJ Wheeler of "Book it CJ" to handle media interviews and bookings. *See Families Impacted*, STOP MASKING KIDS, https://stopmaskingkids.com/families-impacted (last accessed Oct. 30, 2022) (noting for media interviews to contact CJ Wheeler). To date, the Steels have raised approximately $100,000, through their fundraising site. ECF 109-26.

Following Steel's media blitz Ocean Breeze Elementary staff and Board members received numerous hateful, offensive, and crude public comments—

including death threats. BCSB-Steel/Michaud 36-50; BCSB-Steel 900-942. For example, on October 24, 2021, Principal Michaud received the following email:

> I come in peace but with a warning. You will resign and so will the two teachers involved in roping that child's face. I can't fully express to you how viral you are online and in dark places. Soon yourself mostly and the two others entire lives will be laid bare. Anyone related to you also. Complete doxes and home addresses with photos posted. Now I myself and just warning you so that you quit as you know you should before you feel the full wrath of the internet hate machine. If you need examples of what they do to people . . . I'm sure you can guess. Any innocent family you have it's on you to warn them to stay being aware of people around them and to lock their social media. Hells coming. You deserve it more than most I've seen. I expect this to be biblical. Good luck with that. Lol.

BCSB-Steel 000921. Because of the numerous threatening statements, additional security and police presence was required in the days following the interviews. *See Notification Email* (Oct. 25, 2021) (produced by Plaintiffs).

### Investigations and Withdrawal from Brevard School District

Meanwhile, both the District and the Indian Harbor Beach Police Department were conducting separate investigations into the allegations raised by the Steels. The District, for its part, collected written, signed statements from all of the individuals involved as well as reviewed video of S.B. both in the school hallways and on the bus. BCSB-Steel 437-556. The District concluded that "[s]chool and all accompanying personnel acted appropriately," in the course and scope of their positions and closed the investigation as "unfounded." BCSB-Steel 505.

Similarly, the Indian Harbor Beach Police Department conducted a thorough investigation of the incident, which included sworn interviews with all individuals involved and review of school and bus video footage. ECF 109-2 at 1-75. The report

produced documenting the investigation speaks for itself, ultimately concluding there was insufficient evidence indicating any crimes were committed against S.B. *Id.* at 34.

S.B. was withdrawn from Ocean Breeze Elementary, and the District, on October 25, 2021. ECF 109-1 at 1. S.B. currently attends Space Coast Discovery—a private school, which is subsidized in part by available state scholarships. ECF 109-3 at 38:13-15; 42: 2-5. As a private school, S.B. does not have an IEP and does not receive speech, occupational, or physical therapy services through the school. ECF 109-3 at 39:25-40:1.

## **MEMORANDUM OF LAW**

### I.   **Constitutional Claims (Counts I, V, and IX)**

#### *A.   There is No Constitutional Violation in this Case*

##### i.   Claims For Monetary Damages are Not Cognizable Under the Florida Constitution

The Plaintiffs allege a cause of action under Article I, section 23 of the Florida Constitution—the Florida Constitution's right to privacy. However, it is axiomatic that claims for monetary damages under the Florida Constitution are not cognizable. *Smith v. Bell*, No. 06-60750 CIV, 2008 WL 868253, at *9 (S.D. Fla. Mar. 31, 2008). *See Hanney v. Garcia*, No. 8:13-CV-2928-T-36MAP, 2015 WL 1277991, at *3 (M.D. Fla. Mar. 20, 2015) (*citing Depaola v. Town of Davie*, 872 So.2d 377, 380 (Fla. 4th DCA 2004)) ("no cause of action exists for money damages for a violation of a state constitutional right).

Plaintiffs' claims are additionally barred by sovereign immunity because, Article I, § 23 of the Florida Constitution create a cause of action against private persons or contain a right to an award of attorneys' fees and costs for a prevailing party. *See Bidon v. Dep't of Prof'l Reg., Fla. Real Estate Comm'n*, 596 So. 2d 45; *Tucker v. Resha*, 634 So. 2d 756, 759 (Fla. Dist. Ct. App. 1994).

ii.    There is No Substantive Due Process Violation as to the Plaintiffs

In Count V, Plaintiffs bring a claim under § 1983, alleging the Individual Defendants violated their due process rights through requiring S.B. to wear a mask in school and using a string to keep the mask from falling off. However, the implementation of the Emergency Policy does not rise to the level of a substantive due process violation.

As a preliminary matter, Plaintiffs have failed to point to a single factual instance of how the Individual Defendants "implemented" the Mask Policy, instead, Plaintiffs rely solely on what they believe to be true based on the Defendants' job titles. ECF 109-3 at 121:12-23; 124:23-125:8; ECF 109-4 at 73:23-74:14. Nor is there any evidence that any Individual Defendant had knowledge as that S.B. was being masked without the Steel's consent.

As to the Steels individual capacity claims, "regardless of what happened to plaintiff's daughter, this case turns upon whether plaintiff personally suffered any deprivation of a constitution[al] right possessed by her personally." *Porter v. Duval Cnty. Sch. Bd.*, No. 3:09-CV-285-J-32MCR, 2010 WL 1252177, at *4 n. 8 (M.D. Fla. Mar. 26, 2010). They have adduced no evidence that the Individual Defendants took any

action to violate their individual substantive due process rights. Accordingly, their constitutional claims fail. *Hall v. Neal*, No. 5:04–CV–65–OC–10GRJ, 2006 WL 462600, at *2 n. 5 (M.D. Fla. Feb.27, 2006)).

Indeed, this case exemplifies the very reason that "[c]ourts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values." *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968); *see Maddox v. Stephens*, 727 F. 3d 1109, 1119 (11th Cir. 2013). To that end, courts have considered claims involving both mask requirements and excessive restraint and concluded neither rose to the level of a substantive due process violation.

Specifically, in *Lloyd v. School Board of Palm Beach County*, the court concluded that "mask mandates are not conscience-shocking in a constitutional sense."570 F. Supp. 3d 1165, 1181 (S.D. Fla. 2021). Similarly, in *J.P.M. v. Palm Beach County School Board*, the Court rejected a disabled student's claim for a substantive due process violation premised on the "School Board's acts of repeated physical restraints and acts of seclusion." The court did so despite the School Board's own acknowledgment that the plaintiff was "restrained a significant number of times." 916 F. Supp. 2d at 1323.

    iii.   <u>There Was No Violation of the Steels Constitutional Parental Rights</u>

        a.   <u>*Plaintiff Jeffrey Steel Lacks Standing to Bring this Claim*</u>

Plaintiff Jeffrey Steel has no legally protected interest as it relates to this claim. The Due Process Clause of the Fourteenth Amendment protects the rights of ***parents***

to make decisions regarding the care, custody, and control of their children. *D.M.T. v. T.M.H.*, 129 So. 3d 320, 337 (Fla. 2013) (*citing Troxel*, 530 U.S. 57, 65-66 (2000)).

Plaintiff Jeffrey Steel, however, is not a "parent" as defined under Florida law because he is not the biological father of S.B., S.B.'s biological father's parental rights have not been terminated, and S.B. has not been adopted by Steel. Fla. Stat, §39.01 (56), (40), (56). Additionally, Jeffrey Steel is not the "guardian" of S.B. as Mrs. Steel has "sole custody and sole authority of making all decisions"

Accordingly, standing in loco parentis, Steel does not acquire all the rights of a natural parent—necessarily negating a constitutional claim premised on his "parental" rights. *K.A.S. v. R.E.T.*, 914 So. 2d 1056, 1063 (Fla. Dist. Ct. App. 2005); *see e.g.  Irvin v. Foti*, No. CIV. A. 99-1526, 1999 WL 504916, at *7 (E.D. La. July 13, 1999) ("a stepparent who is not also an adoptive parent does not have an interest in the parent-child relationship sufficient to support a constitutional claim.").

> b.    *Mrs. Steel's Parental Rights Claim Otherwise Fails*

The fundamental liberty interest parents have in the care, custody, and control of their children has been extended to a variety of contexts by the Supreme Court, however, mask mandates is not one of them. *Lloyd v. Sch. Bd. of Palm Beach Cnty.*, 570 F. Supp. 3d 1165, 1179 (S.D. Fla. 2021). "[T]he court is skeptical that such a right is broad enough in scope to encompass an interest in keeping one's children from wearing a mask during a global pandemic." *Case v. Ivey*, No. 2:20-CV-777-WKW, 542 F.Supp.3d 1245, 1281 (M.D. Ala. June 1, 2021). "The Plaintiffs have not identified, and the Court is not aware of, any cases standing for the proposition that school

masking requirements violate parents' right to raise their children." *Lloyd*, 570 F. Supp. 3d at 1179 (S.D. Fla. 2021) (citing *Oberheim v. Bason*, No. 4:21-CV-01566, 565 F.Supp.3d 607, 615 (M.D. Pa. Sept. 30, 2021).

In *Lloyd*, this Court's sister court examined a similar Mask Policy and held that no fundamental constitutional rights were implicated and the policy was rationally related to serve a legitimate government interest. "In the absence of any direct precedent on the issue, the Court heeds the guidance from the Supreme Court and Eleventh Circuit and declines to expand the doctrine of substantive due process under the Fourteenth Amendment to encompass a right for parents to opt their children out of mask mandates." *Id*. at 1180.

### B.   *The Individual Defendants are Immune from Liability*

#### i.   The Individual Defendants Have Absolute Legislative Immunity

The Individual Defendants have been included in this suit for one reason and one reason only—implementation of the Emergency Policy. Plaintiffs' claims, however, are barred by absolute legislative immunity.

"[S]tate and regional legislators are entitled to absolute immunity from liability under [section] 1983 for their legislative activities." *Bogan v. Scott-Harris*, 523 U.S. 44, 49, (1998); *Corn v. City of Lauderdale Lakes*, 997 F.2d 1369, 1392 (11th Cir. 1993) (immunity extends to actions taken in legislative capacity). This liability extends to local legislatures, including school board members. *Bryant v. Jones*, 575 F.3d 1281, 1304 (11th Cir. 2009); *B.P. v. N. Allegheny Sch. Dist.*, 579 F. Supp. 3d 713, 731 (W.D. Penn. 2022). Additionally, "[b]ecause the applicability of legislative immunity

necessarily focuses on particular acts or functions, not on particular actors or functionaries, immunity also extends to legislative acts performed by executive officials and other non-legislators." *Bryant*, 575 F.3d at 1304.

Unquestionably the adoption of the Emergency Policy, which was a generally applicable policy to the District as a whole, is an action taken in Jenkins, Belford, and McDougall's legislative capacity. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 688 F. Supp. 2d 1522, 1528 (S.D. Fla. 1988). Moreover, Plaintiffs have offered no rationale for naming Defendant Mullins in the suit, other than he happened to be the Superintendent when the Policy was implemented. Accordingly, legislative immunity likewise applies to Defendant Mullins because Plaintiffs' claim as to him is premised on his implementation of the policy—"a policy decision with prospective implications." *See Bryant*, 575 F.3d at 1306-07 (concluding that executive assistant to chief executive officer of city was entitled to legislative immunity for decision to eliminate city position).

### ii.    Supervisory Liability is Not Permitted by 42 U.S.C. §1983

Nor are the Individual Defendants liable in their supervisory capacity for the actions of Defendants Godden and Dougherty, to the extent they were improper. Supervisory officials are not liable under §1983 for the alleged unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability. *Hartley v Parnell*, 193 F.3d 1263, 1269 (11th Cir. 1999); *Belcher v. City of Foley*, 30 F.3d 390, 1396 (11th Cir. 1994). Indeed, "the mere right to control without any control or direction having been exercised and without any failure to supervise is not enough to support §

1983 liability." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 n.58 (1978) (*citing Rizzo v. Goode*, 423 U.S. 362, 370-371 (1976)).

Supervisory liability occurs only when the supervisor "personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation." *Braddy v. Fla. Dep't of Labor & Emp. Sec.*, 133 F.3d 797, 802 (11th Cir. 1998). Only abuse that is "obvious, flagrant, rampant and of continued duration, rather than isolated occurrences," is sufficiently widespread to put a supervisor on notice. *Doe v. Sch. Bd. of Broward Cnty., Fla.*, 604 F.3d 1248, 1266 (11th Cir. 2010).

Here, there is no evidence that Mullins, Belford, Jenkins, or McDougall knew or should have or could have known that S.B. was wearing a mask against her parents' wishes, how that mask was being worn, or that the mask posed any danger to S.B. None of the Individual Defendants communicated with Mr. or Mrs. Steel, Ms. Godden, or Principal Michaud from August 31, 2021 through October 7, 2021, and S.B.'s educational records, including her IEP were devoid of any documentation regarding masks. Nor is there any evidence that this incident was anything other than an isolated occurrence and miscommunication based on one student's unique needs. Accordingly, supervisory liability is inapplicable in this case. *See C.H. v. Okaloosa Cnty. Sch. Bd., NO. 3:18cv2128-MCR-HTC*, 2022 WL 2789357, at *6 (July 15, 2022) (granting summary judgment in favor of superintendent where superintendent had no knowledge of alleged violation or personally participated in alleged constitutional violation).

**C.**     ***The Individual Defendants are Protected by Qualified Immunity to the Extent Legislative Immunity is Inapplicable***

A public servant is entitled to immunity unless her act is "so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing." *Rehberg v. Paulk*, 611 F.3d 828, 838 (11th Cir. 2010) (*quoting Lassiter*). And, the protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (internal quotations and citations omitted).

Here, the Individual Defendants clearly were acting within their discretionary authority to adopt and implement the Emergency Policy. Fla. Stat. § 1000.41; *see also Courson v. McMillian*, 939 F.2d 1479, 1487 (11th Cir. 1991); *Parks v. City of Warner Robins, Ga.*, 841 F.Supp. 1205, 1210 (M.D. Ga. 1994) (concluding that Mayor and city council were entitled to qualified immunity when adoption of city anti-nepotism policy was within discretionary authority and did not violate clearly established law); *B & L Prod., Inc. v. 22nd Dist. Ag. Ass'n*, 394 F.Supp.3d 1226, 1239 (S.D. Cal. 2019).

Nor was the Plaintiffs right to be free from the Emergency Policy clearly established. "[I]t is inconceivable that [Defendant] could have violated any clearly established constitutional rights, based on materially similar binding precedent, by enacting or enforcing an emergency order aimed at a pandemic that this country and this world have never seen before… and Plaintiff evidently fails to point to any binding precedent that would qualify as such." *Zinman*, 2021 WL 4025722 at *18. "Therefore,

even if the Court were to find that the mask mandate violated any constitutional rights, such rights were certainly not clearly established." *Id. See also Case v. Ivey*, 2022 WL 2441578, at *4 (holding that the rights to dress one's children and what kind of medical care to provide to them in the context of a mask mandate is not clearly established) (emphasis added).

Plaintiffs' emphasis on Department of Health and Department of Education rules is misguided because Plaintiffs improperly focus on what they deem a "clear violation of law." Rules which were subject to challenge in state courts at the time, do not support the contention that the law regarding mask policies in public schools in the midst of an unprecedented pandemic was clearly established. *See, e.g., Dortch v. Alachua Cnty. Sch. Bd.*, 330 So. 3d 976 (Fla. 1st DCA 2021) (challenge to district mask policy in light of DOH rule); *Sch. Bd. of Miami-Dade Cnty. v. Fla. Dep't of Health*, 329 So. 3d 784 (Fla. 3d DCA 2021) (challenge to DOH Rule); *Lloyd*, 570 F. Supp. 3d 1165 (S.D. Fla. 2021); *see also S.B. v. Lee*, 2021 WL 4755619 (E.D. Tenn. Oct. 12, 2021) (granting preliminary injunction prohibiting governor from enforcing requirement to permit parental opt out of mask mandate).

## III.   Disability Discrimination Claims (Counts VIII & XI)

### A.   *Florida Statutes § 393.13*

Section 393.13, Fla. Sta., also known as "The Bill of Rights of Persons with Developmental Disabilities," "only imposes civil liability on the one who harms the victim and perhaps those who are vicariously liable for that person's actions." *Martin*

*v. Sch. Bd. of Miami-Dade Cnty.*, Fla., 2011 WL 13268855, at *2 (S.D. Fla. Feb. 16, 2011) (internal quotes omitted). The Individual Defendants never spoke with, interacted, or were otherwise in contact with S.B. Nor did the Individual Defendants speak with or otherwise instruct Defendants Godden and Dougherty to place a mask on S.B. or use a string to keep the mask from falling off. Accordingly, the Individual Defendants are entitled to summary judgment as a matter of law as to this claim.

### B.   *Florida Statutes, §1000.05 (Count XI)*

#### i.   The Steels Individual Capacity Claims Lack Merit

Plaintiffs have brought suit against Board in their individual capacities under Fla. Stat. §1000.05. But, the Plaintiffs have failed to allege—let alone establish through evidence—that they are in fact disabled or otherwise entitled to protection under these statutes. Accordingly, this claim fail as a matter of law.

It is axiomatic that to bring a claim under Florida Statute § 1000.05, you must be a qualified individual with a disability. *Palermo v. Grunau Co., Inc.*, 220 F. Supp. 3d 1300, 1306 (M.D. Fla. 2016), as amended (Nov. 7, 2016) (*citing Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1255–56 (11th Cir. 2007)); *Silberman v. Miami Dade Transit*, 927 F.3d 1123, 1134 (11th Cir. 2019). Plaintiffs Jeffrey and Shirley Steel do not assert that they are individually qualified for protection under the Fla. Stat. § 1000.05.

Nor can they establish that they were "personally excluded, personally denied benefits, or personally discriminated against," because of her association with S.B. to support an associational discrimination claim. *McCollum v. Orlando Reg. Healthcare Sys.,*

*Inc.*, 768 F.3d 1135, 1143 (11th Cir. 2014).  And, Plaintiffs threadbare, conclusory allegations in the Complaint that they were "discriminated against" will not suffice.

### ii.   S.B. Failed to Exhaust Administrative Remedies

The gravamen of Count XI (Fla. Stat., § 1000.05) is that S.B. was required to wear a mask, which was against her IEP and her parent's wishes, and as a result was denied services available to other students and "a proper, safe, and free appropriate public education." Doc. 49 at ¶ 92. Accordingly, because the core allegation implicates the IDEA's guarantee of a fair and appropriate public education, exhaustion of administrative remedies is required—even where the claim is brought under Fla. Stat. § 1000.05. *Fry v. Napoleon Cmty. Sch.*, 137 S. Ct. 743, 746 (2017); *T.W. v. Franklin Cnty. Sch. Bd.*, 2016 WL 4536408 at *2 (N.D. Fla. Aug. 30, 2016).

A similar challenge to the Florida Department of Health's Rule requiring school mask policies to include a parental opt-out provision was dismissed when the court concluded that the plaintiffs, disabled students and their parents, had failed to exhaust available administrative remedies. *See Hayes v. DeSantis*, 2021 WL 4236698, at *6 (S.D. Fla. Oct. 29, 2021). Ultimately, the court found that the "unique problems facing [the] Plaintiffs" required unique solutions tailored to each child's "individual needs." *Id.* at *11. The same analysis applies here. Moreover, administrative relief would not be futile. Indeed, upon the Steel's request, S.B.'s IEP was amended to include an opt out for the Emergency Policy.

### ii.   S.B. Has Failed to Show Intentional Discrimination

To allege a claim of intentional discrimination, the Florida Education Equity Act requires a showing of deliberate indifference on part of the defendant. *See C.P. v Leon Cnty. Sch. Bd.*, 2005 WL 6074568, at *4 (N.D. Fla. Aug. 27, 2005). To that end, "school administrators will only be deemed deliberately indifferent if their response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Doe*, 604 F.3d at 1259 (internal quotes omitted).

Plaintiffs have failed to show, or even allege, any facts that could be construed as intentional discrimination as to the Individual Defendants. Indeed, they adopted an Emergency Policy that was equally applicable to all students. And, even if the Emergency Policy was misguided, as Plaintiffs' allege, "[a]ctions and decisions by officials that are merely inept, erroneous, ineffective or negligent do not amount to deliberate indifference." *Dallas Indep. Sch. Dist.*, 153 F.3d at 219; *see also J.P.M.*, 916 F. Supp. 2d at 1322 (rejecting ADA and 504 claims where there was no evidence of intentional discrimination or deliberate indifference).

## III.   Tort Claims (Counts XII & XV)

### A.     Intentional Infliction of Emotional Distress (Count XII)

"To constitute intentional infliction of emotional distress, conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency.'" *CAB v. St. Lucie Cnty. Sch. Bd.*, No. 09-14296-CIV, 2010 WL 11597188, at *6 (S.D. Fla. Apr. 16, 2010) (*quoting Metropolitan Life Ins. Co. v. McCarson*, 467 So.2d 277, 278 (Fla. 1985)). This is not that case.

Here the Individual Defendants adopted and implemented an Emergency Policy during the height of a once-in-a-century global pandemic. Regardless of political beliefs or views with respect to mitigation measures, the sincerity and good faith of all involved is beyond question. Accordingly, and for the reasons previously noted, the Individual Defendants' adoption and implementation of the Emergency Policy was not "as atrocious and utterly intolerable in a civilized community," and thus, Defendants are entitled to summary judgment. *Short v. Immokalee Water & Sewer Dist.*, 165 F. Supp. 3d 1129 (M.D. Fla. 2016).

**B.    Defamation (as to Defendant Jenkins)**

The Steels allege a claim for defamation as to Defendant Jenkins only. However, Jenkins is entitled to summary judgment because the Steels—limited public figures for the purposes of this case—cannot establish that Jenkins spoke with actual malice and additionally that Jenkins' statements were anything other than opinions.

Whether a plaintiff is a public figure "is a question of law to be determined by the court[.]" *Id.* (*quoting Mile Marker, Inc. v. Petersen Publ'g, LLC*, 811 So. 2d 841, 845 (Fla. Dist. Ct. App. 2002)). A limited public figure is someone who has thrust himself/herself to the forefront of particular public controversies in order to influence the resolution of the issues involved. *Id.* at 1156 (citing *Tobinick v. Novella*, 848 F.3d 935, 945 n.9 (11th Cir. 2017) (*quoting Silvester v. Am. Broad. Cos.*, 839 F.2d 1491, 1494 (11th Cir. 1988))). If the existence of a public controversy is established, the court asks the following to determine whether an individual is a limited public figure: (1) Did the

31

individual play a central role in the controversy? and (2) Was the defamation germane to the individual's role in the controversy? *Id. citing Turner*, 879 F.3d at 1272.

Plaintiffs Jeffrey and Shirley Steel are unquestionably limited public figures. As explained above, by the fall of 2021, mitigation measures surrounding COVID-19 generally, and specifically in schools, had become a political flashpoint. The Steels inserted themselves into the controversy when Jeffrey Steel chose to appear at a press conference that received national attention and thereafter participated in interviews with over fifteen different media outlets and broadly disseminated photos of S.B. to those media outlets for publication. No one forced the Steels into the spotlight. Indeed, the District would have been specifically prohibited by the Family Educational Rights and Privacy Act, from disseminating any information with respect to the allegations in the Complaint.

And each of the alleged defamatory statements by Jenkins is related to the controversy surrounding S.B. Specifically, Plaintiffs take issue with the following statements:

> The only people I have ever heard refer to a child with Downs Syndrome as 'disabled child with an enlarged tongue and nonverbal' over and over again is Representative Fine and the child being referred to's (sic) stepfather. It's despicable. (ECF-37) (Feb. 11, 2022).

> She has a voice. She is a bright little girl who can self advocate quite well according to those that were with her every day. That man doesn't speak up for her, he diminishes her capability and voice every time he speaks as if she is incapable and uses her to promote his false outrage. I don't bully her stepfather. I stood up for myself when he lies about contacting me multiple times and that I refused to speak with him. I'm not the one who lied to a police department. (ECF-38) (Feb. 19, 2022).

@TinaDescovich Moms for Liberty @VoteRandyFine @GovRonDeSantis Facts hurt. Lies hurt more. Used this false story by a parent to push hate to LGBTQ children. Seems reoccurring in their playbook. Two stories rising to national attention proven false. (ECF-39) (Apr. 6, 2022).

"What about this family you hosted at a press conference that crowdfunded over $100,000 with fraudulent photos?" (ECF-40) (Feb. 5, 2022).

Accordingly, for purposes of their defamation claim, the Plaintiffs must establish Jenkins' acted with actual malice.

Of course, the actual malice standard is "famously daunting," and Plaintiffs do not come close to establishing it in this case. *Mastandrea v. Snow*, 333 So. 3d 326, 332 (Fla. Dist. Ct. App. 2022) (*quoting McFarlane v. Esquire Magazine,* 74 F.3d 1296, 1308 (D.C. Cir. 1996)).

First, Jenkins statements were opinion statements premised on facts widely known and disseminated at the time, and are therefore protected by the first amendment. *VanCamp v. McNesby*, 2008 WL 2557539 at *19 (Fla. N.D. June 20, 2008) "Pure opinion is based upon facts that the communicator sets forth in a publication, or that are otherwise known or available to the reader or the listener as a member of the public." *Zambrano v. Devanesan*, 484 So. 2d 603, 606 (Fla. Dist. Ct. App. 1986) (citing *Hay v. Independent Newspapers*, Inc., 450 So. 2d 293 (Fla. 2d DCA 1984)). Based in part on the Steels' actions to garner national media attention, the allegations in this case were widely reported on—as was the outcome of the police investigation into the same.

33

And the evidence establishes that Steel, at best, initially made misleading statement to the investigators regarding the photos he disseminated to the public. Ms. Jenkins was not the first to share this information; indeed, it was brought to the public's attention by the Steels and thereafter reported on in the local paper and on national news. The totality of Ms. Jenkins' statements were premised upon facts, either included in the articles attached to her statements or that were otherwise widely known and were consistent with the police report findings. Thus, Ms. Jenkins' statements were pure opinion.

And, even if Ms. Jenkins' statements were "caustic" or "pejorative", they had a basis in fact, and are therefore not actionable in this case. *Palm Beach Newspapers, Inc. v. Early*, 334 So. 2d 50, 52 (Fla. 4th DCA 1976). Plaintiffs have not nor cannot establish that the statements were false or that Jenkins acted with the requisite intent before posting the statements. Succinctly put, the Steels "[can] not invite the attention of the public as [they] did through [their] efforts at self-promotion and then complain if the attention was not favorable." *From*, 400 So. 2d at 57.

## <u>CONCLUSION</u>

For the foregoing reasons, Individual Defendants respectfully request this Court grant the instant motion and enter final summary judgment in their favor, as against the claims brought by Plaintiffs, and for such other relief as this Court deems proper.

Dated November 1, 2022.

Respectfully submitted,

/s/ *Robert J. Sniffen*
**ROBERT J. SNIFFEN (Trial Counsel)**
Florida Bar Number: 0000795
rsniffen@sniffenlaw.com
**SNIFFEN & SPELLMAN, P.A.**
123 North Monroe Street
Tallahassee, Florida 32301
Telephone: (850) 205-1996
Facsimile: (850) 205-3004
*Counsel for Defendant Brevard*
*County School Board*

## CERTIFICATE OF SERVICE

The undersigned certifies that on this 1st day of November 2022, a true and correct copy of the foregoing was electronically filed in the US District Court, Middle District of Florida, using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ *Robert J. Sniffen*
**ROBERT J. SNIFFEN**